UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JON-ERIK ROOSEVELT BOLDS, JR.,

Plaintiff,

v.

LUEVANOS, et al.,,

Defendants.

No.  1:21-cv-01668-KES-SAB (PC)

FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(ECF No. 71)

Plaintiff is proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendants' motion for summary judgment, filed December 18, 2023.

## I.

## RELEVANT BACKGROUND

This action is proceeding against Defendant Luevanos for the use of excessive force on May 28, 2021, against Defendants Luevanos, Valles, Lucio, Magana, and Flores for the use of excessive force September 21, 2021, and against Defendants Lucio, Sosa, Bailey, Rafferty, and Espericueta for retaliation.[1]

---

[1] Plaintiff incorrectly identified Defendant Valles as "Valluas"; Defendant Lucio as "Lucos"; and Defendant Magana as "Magania."

Defendants filed an answer to the complaint on September 23, 2022.  (ECF No. 21.)  After an unsuccessful settlement conference, the Court issued the discovery and scheduling order on February 7, 2023.  (ECF No. 53.)

On December 18, 2023, Defendants filed the instant motion for summary judgment. (ECF No. 71.)  Plaintiff filed an opposition on March 8, 2024, and Defendants filed a reply on March 13, 2024.  (ECF Nos. 81, 82.)

**II.**

**LEGAL STANDARD**

**A.    Summary Judgment Standard**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

2

1   In arriving at these Findings and Recommendations, the Court carefully reviewed and

2   considered all arguments, points and authorities, declarations, exhibits, statements of undisputed

3   facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of

4   reference to an argument, document, paper, or objection is not to be construed to the effect that

5   this Court did not consider the argument, document, paper, or objection. This Court thoroughly

6   reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**DISCUSSION**

**A.      Summary of Plaintiff's Complaint**

10  On May 28, 2021, Sergeant Luevanos used excessive force to remove Plaintiff from the

11  transportation bus at Lerdo Justice Facility.  While Plaintiff was handcuffed, Sergeant Luevanos

12  pulled Plaintiff off the bus while holding him a chokehold.

13  On September 21, 2021, officers Valles and Velo tried to pull Plaintiff into a cell while he

14  was in restraints causing his head to swell.  Plaintiff asked to go to medical but was denied and

15  threatened by another officer that if he didn't go to court they would call Sergeant Luevanos who

16  snatched him off the bus.  Sergeant Luevanos was called and pulled Plaintiff out of his seat in the

17  cell and into the hallway causing his hands to swell.  In the hallway, Sergeant Luevanos

18  encouraged other officers to help use excessive force to restrain Plaintiff even though he was

19  already in restraints.  Plaintiff begged to walk on his own but he was forced into a restraint chair

20  while officer Flores stood hard on Plaintiff's foot and officer Magana pushed Plaintiff down on

21  his handcuffs with all his body weight.  Officer Valles strapped Plaintiff to the chair so tight that

22  medical had to tell him to loosen it.  Sergeant Luevanos pulled Plaintiff's head and snatched it

23  back causing Plaintiff's head to bounce against the chair.  He then pulled and squeezed Plaintiff's

24  head while pocking a finger in his eye.  Plaintiff was subsequently placed in a padded safety cell.

25  Plaintiff did not receive medical treatment until September 24, 2021.  On this date, he was able to

26  show bruising and swelling on multiple parts of his body.

27  After the May 28, 2021, incident Plaintiff started having problems with other officers at

28  the Lerdo Justice Facility.

On June 3, 2021, Plaintiff asked officer Lucio for a grievance form to report the excessive force incident on March 28, 2021 involving Sergeant Luevanos.  Sergeant Lucio denied to provide Plaintiff a grievance so he mentioned filing a grievance against Lucio as well.  Lucio again denied a grievance and Plaintiff was placed in administrative segregation because he would not answer questions regarding inmates who assaulted him.  While in administrative segregation, Plaintiff explained to officer Sosa that he needed grievances to complain about Luevanos and Lucio, but Sosa denied the request.  Sosa then began to search Plaintiff's cell, denied shower privileges, denied telephone privileges, and denied outside recreation to prevent Plaintiff from filing a grievance.

On June 29, 2021, Plaintiff explained to officer Bailey and sergeant Rafferty that he wanted to file a grievance against Luevanos and Lucio but was denied by officer Sosa.  Officer Bailey denied any wrongdoing on the part of officer Sosa.  Plaintiff also told sergeant Rafferty about the misconduct by Luevanos, Lucio and Sosa who stated, "accusing her officers of harassment will get me placed on suicide watch."  The actions by Bailey, Rafferty, and Sosa did not happen until after Plaintiff mentioned writing a grievance against sergeant Luevanos.

Plaintiff has reason to believe that officer Espericueta was notified about the excessive force incident on May 28, 2021, because she was the officer in the control booth who opened and closed the cell door allowing officer Sosa to continuously search his cell.

**B.      Statement of Undisputed Facts[2],[3]**

1.      Sergeant Luevanos was employed with the Kern County Sheriff's Office for 33 years.  (Declaration of Luevanos (Luevanos Decl.) ¶ 1.)

2.      During this particular incident, he was a sergeant and was assigned to the Lerdo Patrol Unit.  (Luevanos Decl. ¶ 10.)

3.      He would not normally assist with escorting inmates, but he received a distressed

---

[2] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by defendant as undisputed.  Local Rule 56-260(b).  Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified complaint and opposition.  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

[3] Hereinafter referred to as "UF."

4

call.  (Luevanos Decl. ¶ 14; Declaration of Flores (Flores Decl.) ¶¶ 49-51.)

4.      He could see Plaintiff was in a cage, which meant he was a security risk because general population inmates are not transported in cages.  (Luevanos Decl. ¶ 16.)

5.      At the time of the incident, it was evening and it was dark inside the bus. (Luevanos Decl. ¶ 17.)

6.      He entered the bus to an unknown situation and both he and the other deputy on scene were armed.  (Luevanos Decl. ¶ 19.)

7.      Being in close quarters with inmates while armed is more dangerous because they can reach the weapon.  (Luevanos Decl. ¶ 19.)

8.      He could see Plaintiff was a red band, which is a security escape risk.  (Luevanos Decl. ¶ 23.)

9.      He chose not to use pepper spray because it is harsh and he was not aware if other inmates were still on the bus.  (Luevanos Decl. ¶ 29.)

10.     He chose not to use the taser because he feared the inmate would fall and hit his head on the metal cages in the bus.  (Luevanos Decl. ¶ 32.)

11.     He did not use the carotid, but chose to use another type of hand hold because those are typically less injurious.  (Luevanos Decl. ¶ 31.)

12.     Starting June 8, 2021, Plaintiff's file contained a court order allowing force to be used to successfully transport him to court and that court order was in effect during the September 21, 2021 incident.  (Luevanos Decl. ¶ 59; Declaration of MaryClaire Walsh (Walsh Decl.) ¶ 4.)

13.     After May 28, 2021, Plaintiff filed 44 grievances and 4 appeals.  (Walsh Decl. ¶ 4.)

14.     While in administrative segregation cells, inmates are not allowed to allowed to have anything other than pre-approved items due to inmate safety.  (Declaration of Rigoberto Lucio (Lucio Decl.) ¶ 11.)

15.     Plaintiff filed a grievance on June 14, 2011, shortly after the suicide watch cell placement.  (Walsh Decl. ¶ 5.)

16.     Deputy Sosa did search Plaintiff's cell while Plaintiff was out to court.

5

1 | (Declaration of Sosa (Sosa Decl.) ¶ 11.)

2 |       **C.**      **Defendants' Motion for Summary Judgment**

3 |     Defendants argue that they all acted reasonably and within the confines of the

4 | constitution and are entitled to summary judgment or in the alternative summary adjudication.

5 | The Court will address each of Plaintiff's three claims separately below.

6 |       1.     <u>Excessive Force - May 28, 2021 Incident</u>

7 |     In the operative complaint, Plaintiff alleges that on May 28, 2021, Defendant sergeant

8 | Luevanos used excessive force by removing him from the transportation bus using a chokehold

9 | while Plaintiff was in restraints.[4]

10 |     Defendant Luevanos argues that Plaintiff's allegations are merely "colorable" at best, and

11 | insufficient to create a genuine issue of material fact, his actions were reasonable, and he is

12 | entitled qualified immunity.

13 |     The right of pretrial detainees to be free from excessive force is guaranteed by the Due

14 | Process Clause of the Fourteenth Amendment and is governed by Fourth Amendment standards.

15 | <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 397-398, 399 (2015). Accordingly, a pretrial detainee

16 | establishes that excessive force was used against him by showing "that the force purposely or

17 | knowing used against him was objectively unreasonable." <u>Id.</u> at 396-397. "[O]bjective

18 | reasonableness turns on the 'facts and circumstances of each particular case.' " <u>Id.</u> (quoting

19 | <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). A "pretrial detainee can prevail by providing only

20 | objective evidence that the challenged governmental action is not rationally related to a legitimate

21 | governmental objective or that it is excessive in relation to that purpose." <u>Kingsley</u>, 576 U.S. at

22 | 398.

23 |     "A court must make this determination from the perspective of a reasonable officer on the

24 | scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." <u>Id.</u> at

25 | 397. "A court must also account for the 'legitimate interests that stem from [the government's]

26 | need to manage the facility in which the individual is detained,' appropriately deferring to

27 | 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal

28 | ---

[4] It is undisputed that Plaintiff was a pretrial detainee at the time of the incidents in the operative complaint.

order and discipline and to maintain institutional security.' " Id. (quoting Bell v. Wolfish, 441 U.S. 520, 240 (1979)).

"Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley, 576 U.S. at 397.

The main determination of whether law enforcement officers violated the Fourth Amendment by using excessive force is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." Williamson v. City of National City, 23 F.4th 1146, 1151 (9th Cir. 2022) (internal quotation marks and citation omitted); see also Lombardo v. City of St. Louis, 594 U.S. 464, 467-68 (2021). "All determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " Scott v. Henrich, 39 F.3d 912, 914 (9th Cir. 1994) (quoting Graham v. Connor, 490 U.S. 386, 396–97 (1989)).

Here, Plaintiff's complaint alleges that on May 28, 2021, sergeant Luevanos "used excessive force to remove" Plaintiff from the transportation bus at Lerdo Justice Facility, by dragging him "off a bus while holding [him] in a chokehold, all while in restraints."  (ECF No. 18 at 4.)

Defendant Luevanos declares as follows:

In the evening on May 28, 2021, I was assigned to Lerdo Patrol Unit, working the traffic, and visiting area.  When I'm on patrol, I'm armed with my duty weapon (gun) and my Taser.

As a sergeant on patrol, I am worried about escapes, perimeter control, and everyone's safety.

I heard over the radio the transportation deputy needed assistance with an uncooperative inmate.  I could tell by the tone of voice that he was a "stressed deputy."

1

2

My first interaction with [Plaintiff] was when I was trying to get him to exit the bus.

3

I would not normally assist with escorting inmates off the transportation bus, but due to Deputy Jimerson's distressed radio call, I responded to the scene.

4

5

Sergeants usually respond to high stressful situations and most inmates will never see a sergeant.

6

7

I was aware that [Plaintiff] was a security risk because the cages are used for security risk inmates. General Population inmates are not held in cages.

8

It was evening and the bus was very dark inside.

9

10

11

I was at the bottom of the stairs, looking up into a dark bus. Those already on the bus have had time to have their eyes adjust to the darkness. My eyes have not yet had the time to adjust, so I am essentially walking in blindly. I am at my highest level of alertness when I am making my assessment on how to proceed.

12

13

14

I entered the bus and observed Deputy Jimerson attempting to talk [Plaintiff] out of the ad-seg bus cell. I could see Deputy Jimerson was armed. Whenever you go onto a bus, it's close quarters, which means it's more dangerousness than usual to be armed. If [Plaintiff] had already gotten out of his iron, he could swing it and he could seriously injure Deputy Jimerson, myself or possibly other inmates.

15

16

In the bus, the cages are in the front, and it's open in back. [Plaintiff] is in front, in one of the cages. I was not yet aware if other inmates remained on the bus.

17

18

I heard Deputy Jimerson order [Plaintiff] several times to exit the bus and I could hear [Plaintiff's] response, "I'm not going to get out!"

19

20

Deputy Jimerson reached and placed his right hand underneath [Plaintiff's] left bicep and [Plaintiff] resisted and pulled back to sit back down. [Plaintiff] stated again, "I'm not going in."

21

22

I could see [Plaintiff] was a red band, a security escape risk inmate, and he was in restraints; however, I know from experience inmates are able to get out of their iron.

23

24

25

At this point I am unaware of the inmate's size or aggression level.
I first try the least aggressive form of persuasion and simply ask [Plaintiff] to exit the bus. I asked [Plaintiff], "Is there anything I can do to get you out of the bus?" This is the line that I use frequently with other inmates. I will first ask a non-complying inmate if there is anything I can do to get them to comply.

26

27

I do not recall if he responded, or what he said, but I do recall his answering making clear to me he was not going to cooperate.

28

8

With the tight quarters on the bus, I made the administrative decision to extract [Plaintiff] from the bus.

I do not know who is still on the bus beyond the cages so I did not use pepper spray.

I have been pepper sprayed before, in training.  They spray us so we understand the full effects of what it feels like.  Before I ever use it I always ask myself, "Am I really going to do this to another human being?"

I know not to use the carotid because it's a violation of the policy.  Also, if he passes out or gets dizzy, he's much too large for me to carry and if he falls, I would also fall and this would be dangerous to us both as we are exiting the bus.

I did not use my taser because the inmate could have fallen over and hit his head on the metal from the bus cages.  Instead, I chose to use my hands because hand holds usually result in less injury.

I reached out my right hand to the back of his neck and pulled his head down while I am pulling his wrist cuffs down.  This essentially forces the inmate to move his whole body forward and down and bend over at the waist.  This is a pain compliance technique; so long as the inmate follows the movements, he will not be in pain.

[Plaintiff] comes out of the chair fairly easily because the force puts him at an awkward angle, putting him off balance.  Because he's off balance, he's more included to follow my physical lead and direction.

At this point, I am standing in front of [Plaintiff] and he is standing, facing me.  He has his head down and he's bent over at the waist.

As soon as he's standing, I notice he's bigger and stronger than I could assess while he was sitting.  He appears to be around 6'3" and 220-240 pounds.

There is a risk he could overpower me and my gun would be within his reach.  To maintain control over [Plaintiff] and keep our weapons retained in such close quarters, I reached under [Plaintiff's] chest with my right arm and grabbed his right arm pit with my right hand to control his movement.  I recall the stench on my hand was very foul afterwards and having to immediately wash my hands.

Being this close to him, if he flinches or flexes, I will feel it before I see it and I will be able to respond faster.
I held [Plaintiff's] upper body and head down with my body weight for protection because otherwise he would be standing approximately 3 inches above me.
I forced him to bend over and walk forward and I walked backwards down the steps to the driveway.

The exit was surprisingly easy because [Plaintiff] was off balance and he allowed me to lead him off the bus and to the driveway.

[Plaintiff] again started to resist, but stopped when additional personnel arrived.

I handed [Plaintiff] off to the other deputies and advised the deputies and advised the deputies to get him medically cleared.  Any time we use force or holds, we always get them medically cleared, regardless of any injuries.

[Plaintiff] did not complain of any pain at that time, not after and not during the extraction.  [Plaintiff] did not indicate he was injured in any way.  He did not speak to me during the extraction.  Our only exchange was in the beginning, and then me giving him directions to descend the bus steps.  He also did not appear to have any injuries.

I did not accompany [Plaintiff] to the nurse, and at this point, my interaction with [Plaintiff] was done.

After the bus incident on May 28, 2021, [Plaintiff] was classified as Orange Band, meaning he was staff assaultive.

(Luevano Decl. ¶¶ 10-46.)

It is undisputed that sergeant Luevanos would not normally assist with escorting inmates, but he received a distressed call.  (UF 3.)  He could see Plaintiff was in a cage, which meant he was a security risk because general population inmates are not transported in cages.  (UF 4.)  At the time of the incident, it was evening and it was dark inside the bus.  (UF 5.)  He entered the bus to an unknown situation and both he and the other deputy on scene were armed.  (UF 6.)  Being in close quarters with inmates while armed is more dangerous because they can reach the weapon.  (UF 7.)  He could see Plaintiff was a red band, which is a security escape risk.  (UF 8.)  He chose not to use pepper spray because it is harsh and he was not aware if other inmates were still on the bus.  (UF 9.)  He chose not to use the taser because he feared the inmate would fall and hit his head on the metal cages in the bus.  (UF 10.)  He did not use the carotid, but chose to use another type of hand hold because those are typically less injurious.  (UF 11.)

The allegation that "excessive force" was used is a legal conclusion, rather than a factual allegation, which the Court is not required to presume true.  See, e.g., Keates v. Koile, 883 F.3d 1228, 1243 (9th Cir. 2018) (the Court is not "bound to accept as true a legal conclusion couched as a factual allegation or an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation marks and citations omitted).  Further, that a "chokehold" was used is conclusory in nature as well as it denotes an infamous term within the jail system.  While the use

10

1  of a dangerous, injury-causing chokehold on a non-resisting restrained individual violates the

2  constitution.  Tuuamalemalo v. Greene, 946 F.3d 471, 477 (9th Cir. 2019), Plaintiff's allegations

3  lack specificity as the circumstances involving the alleged "chokehold."  Lowry v. City of San

4  Diego, 858 F.3d 1248, 1256 (9th Cir. 2017) (assessing a particular use of force requires

5  consideration of the "specific factual circumstances" surrounding the event); Nelson v. City of

6  Davis, 685 F.3d 867, 879 (9th Cir. 2012).  Plaintiff fails to provide basic information (despite

7  filing an opposition to Defendants' motion for summary judgment), such as the specific type of

8  restraint used (what type of chokehold), body placements, resisting movements, injuries, and the

9  ability to exit the bus.  See Keeler v. Cnty. of San Diego, No. 21-CV-1979-RSH-DDL, 2023 WL

10  6192773 (S.D. Cal. Feb. 13, 2023) (holding facts insufficient for the chokehold claim when

11  missing basic supporting information); Casey v. City of Santa Rosa, No. 4:18-CV-07731-KAW,

12  2019 WL 4345963 (N.D. Cal. Sept. 12, 2019) (holding complaint requires more than merely

13  pleading facts consistent with defendant's liability); Holmes v. Cnty. of Orange, No.

14  816CV00867JLSJCG, 2017 WL 11632298 (C.D. Cal. Aug. 17, 2017) (acknowledging that

15  merely including the word "chokehold" without additional facts in the complaint is not enough to

16  state a claim and survive a motion to dismiss, though it may pass the screening stage).

17          First, Plaintiff does not allege, nor support with evidence, the presence of an injury

18  consistent with being drug, nor with being held in a carotid.  Indeed, while an injury is not

19  dispositive, Plaintiff does not allege any injury at all with respect to the May 2021 incident which

20  is probative on whether the alleged use of force is excessive and unreasonable.  See Hudson v.

21  McMillian, 503 U.S. 1, 7–9 (1992).

22          Second, it is undisputed that Luevanos was only called to the scene because Plaintiff was

23  not cooperating and was resisting other officers.  (UF 3.)  In fact, Plaintiff acknowledges that

24  deputies threatened him on September 21, 2021 to call sergeant Luevanos to the scene for a

25  subsequent uncooperative incident.  (ECF No. 18 at 4-5, 8, 12.)  Moreover, it is undisputed that

26  Luevanos is only called to the scene after an incident warrants his presence; he would not

27  otherwise assist in transporting inmates.  (UF 3.)

28  ///

Third, although Luevanos acknowledges that he put his hands on Plaintiff and used a hold on him for forcefully remove him from the bus, it does not mean the force was excessive.  Under the circumstances, Luevanos used the least amount of force available to him on the spectrum (aside from words), a physical hold instead of pepper spray or a taser, or more, and there were no injuries.  Thus, while Plaintiff's allegations may be colorable, they do not create a genuine issue of material fact that the force was "excessive."  See United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir.1989) ("A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact.") (internal citation omitted).

Applying the Kingsley factors, Defendant Luevano's actions were objectively reasonable under the circumstances.  Luevano initially attempted to remedy the issue by talking with Plaintiff, but he was not successful.  Recognizing that Plaintiff was not going to voluntarily exit the buss, Luevano utilized a physical hold to destabilize Plaintiff while safely exiting him from the bus which resulted in no physical injuries to Plaintiff.  The technique used by Luevano was reasonable given that he was stepping into an unknown situation with an unknown inmate. Luevano only knew Plaintiff was a red security risk band, viewed the size and demeanor of Plaintiff, and the dispatch call by a perceived "stressed" deputy about an "uncooperative inmate." It was not known if other inmates were on the bus, and he used the amount of force necessary to overcome Plaintiff's refusal to exit the bus.

Plaintiff has offered no additional facts surrounding the alleged chokehold incident regarding resisting, compliance, injuries sustained or type of hold, nor did he dispute the additional factual contentions Sgt. Luevanos provided in his declaration. Thus, it remains undisputed that Plaintiff resisted, sergeant Luevanos used a non-injurious hold, and Plaintiff was safely exited from the bus.  Accordingly there are no genuine issues of material fact regarding this incident and summary judgment should be granted.[5]

///

---

[5] Because the Court finds summary judgment should be granted in favor of Defendant Luevanos on the merits of this claim, the Court need not reach the issue of qualified immunity.

1       2.      Excessive Force - September 21, 2021 Incident

2            Plaintiff alleges that Defendants Luevanos, Valles, Magana, Lucio, and Flores used

3  excessive force on September 21, 2021, during the extraction and subsequent application of chair

4  restraints.

5            Defendant Luevanos argues that his actions during the extraction and subsequent

6  application of chair restraints was not excessive.  Defendants Valles and Magana argue their

7  actions do not amount to excessive force.  Defendant Lucio submits that he was not involved in

8  this incident.  Defendant Flores argues his actions did not amount to excessive force.  In the

9  alternative, Defendants argue they are entitled to qualified immunity.

10           As stated above, the right of pretrial detainees to be free from excessive force is

11  guaranteed by the Due Process Clause of the Fourteenth Amendment and is governed by Fourth

12  Amendment standards. Kingsley v. Hendrickson, 576 U.S. at 397-398, 399.  Accordingly, a

13  pretrial detainee establishes that excessive force was used against him by showing "that the force

14  purposely or knowing used against him was objectively unreasonable." Id. at 396-397.

15  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.' " Id.

16  (quoting Graham v. Connor, 490 U.S. at 396). A "pretrial detainee can prevail by providing only

17  objective evidence that the challenged governmental action is not rationally related to a legitimate

18  governmental objective or that it is excessive in relation to that purpose." Kingsley, 576 U.S. at

19  398.

20           "A court must make this determination from the perspective of a reasonable officer on the

21  scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. at

22  397. "A court must also account for the 'legitimate interests that stem from [the government's]

23  need to manage the facility in which the individual is detained,' appropriately deferring to

24  'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal

25  order and discipline and to maintain institutional security.' " Id. (quoting Bell v. Wolfish, 441

26  U.S. at 240).

27           "Considerations such as the following may bear on the reasonableness or

28  unreasonableness of the force used: the relationship between the need for the use of force and the

amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

### a.   Defendant Lucio

As an initial matter, based on a review of the operative first amended complaint, there are no factual allegations alleging that Defendant Lucio had any involvement with the alleged use of excessive force on September 21, 2021, and the Court's June 29, 2022 screening order finding such a claim was a scrivener's error.  Moreover, Plaintiff's opposition makes no mention of Defendant Lucio being involved in any use of force, let alone excessive force.  Consequently, summary judgment must be granted in favor of Defendant Lucio on this claim.

### b.   Defendants Luevanos, Valles, Magana, and Flores

It is undisputed that starting June 8, 2021, Plaintiff's file contained a court order allowing force to be used to successfully transport him to court and that court order was in effect during the September 21, 2021 incident.  (UF 12.)

As mentioned, Plaintiff's amended complaint, which was signed under penalty of perjury, may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). The court on summary judgment must assume the truth of Plaintiff's verified pleadings. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999) (citing T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors, Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987)).  Here, in the operative complaint, Plaintiff alleges that on September 21, 2021, Defendants officers Valles and Velo tried to pull him into a cell while he was in restraints, causing his hand to swell.  Officers Valles and Velo threatened, "If I don't go to court they gone call Sgt. Luevanos who snatched me off the bus to make me go to court."  Thereafter, Sergeant Luevanos was called the scene as Plaintiff was requesting medical care.  Sergeant Luevanos pulled Plaintiff out of his seat and out of the cell into the hallway, with the assistance of officers Valles and Velo.  In the hallway, Luevanos encouraged other officers to use excessive force to restrain him, although he was already in restraints.  Plaintiff was begging to walk on his own, but

14

1   he was forced into a restraint chair.  Officer Flores "stooded [sic] hard" on Plaintiff's foot, and

2   officer Magana pushed down on Plaintiff's handcuffs with all his body weight.  Officer Valles

3   strapped Plaintiff tightly to the chair and medical had to tell him to loosen it.  Thereafter, sergeant

4   Luevanos pulled and snatched Plaintiff's head back against the chair causing his head to bounce

5   against the chair.  Luevanos readjusted his hand on Plaintiff's head squeezing tight while poking

6   a finger in his eye and pulling his hair to keep his head still.  After Plaintiff was strapped to the

7   chair, he was placed in a safety padded cell.  After this incident, Plaintiff suffered back and knee

8   pain for which he takes medication.  On September 24, 2021, Plaintiff had bruising and swelling

9   on multiple parts of his body caused by the September 21, 2021, excessive force.

10          Defendant Luevanos argues that (1) he used low levels of physical force to gain

11   compliance by pulling him out of the cell, then forcing his head still; (2) Plaintiff does not allege

12   he voiced any complaints of pain. Plaintiff also does not allege any pain or injuries from pulling

13   him out of the cell, nor does he explain how or where on his body he was pulled; (3) his actions to

14   gain compliance were made to maintain order within the jail and pursuant to the June 8, 2021

15   Kern County Superior Court Order with the intent of transporting Plaintiff to court; (4) he

16   previously dealt with Plaintiff and was aware of his size, weight, demeanor, and orange band-

17   indicating he was staff assaultive; and (5) Plaintiff was actively resisting.

18          Defendants Valles and Magana argue they were trying to secure Plaintiff into the chair

19   using a pain compliance technique, and they only used the amount of force necessary to gain

20   compliance and did not apply the straps too tightly.  In addition, the alleged bruising and swelling

21   suffered by Plaintiff are minimal.

22          Defendant Flores argues his actions in standing firmly on Plaintiff's foot while his ankles

23   are being strapped to the chair is necessary to prevent being kicked in the face and his decision to

24   his foot and not his hands was reasonable.  In addition, Plaintiff did not suffer an injury from the

25   use of force on his foot.

26          The parties have different accounts as to the amount of force used.  Plaintiff claims Valles

27   forced him into a restraint chair causing swelling and threatened to call the Luevanos just before

28   he requested medical attention.  When Luevanos arrived he encouraged other officers to use

excessive force to restrain him even though he was already in restraints.  Plaintiff begged to walk but was forced into a restraint chair, after which Flores stood hard on Plaintiff's foot while Magana pushed down on his handcuffs with all his body weight.  Valles strapped Plaintiff tightly to the chair and medical had to tell him to loosen it.  Luevanos then pulled Plaintiff's head back against the hair causing it to bounce, then he readjusted his hand on Plaintiff's head squeezed tightly while poking his finger in Plaintiff's eye.  Yet, Defendants claim their use of force during the extraction and subsequent application of the restraint was not excessive and Plaintiff suffered only minimal injuries.  Defendants reason that the use of force was necessary only to secure Plaintiff into the restraint chair using a pain compliance technique.  Based on the conflicting evidence, the Court finds that there are material disputes of fact that preclude the granting of Defendants' motion for summary judgment.  Assuming the truth of Plaintiff's allegations in his amended complaint, evidence produced by Defendants conflicts with Plaintiff's evidence with respect to whether and/or what extent Plaintiff was resistant or combative during the incident such that Defendants' application of force was necessary. Second, assuming some force was warranted, there is a material issue of fact regarding whether Defendants' force was objectively reasonable.  See Kingsley, 576 U.S. at 396-97.  Accordingly, summary judgment should be denied as to Defendants Luevanos, Valles, Magana, and Flores.

### c.    Qualified Immunity

Defendants Luevanos, Valles, Magana, and Flores argue they are entitled to qualified immunity because "[t]he use of the chair, and the pain compliance techniques by the deputies to force Plaintiff into the chair have not been held to be unconstitutional."  (ECF No. 71 at 21.)

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). When considering an assertion of qualified immunity, the court makes a two-pronged inquiry: (1)

16

whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) whether such right was clearly established at the time of defendant's alleged misconduct. Pearson, 555 U.S. at 232 (quoting Saucier v. Katz, 535 U.S. 94, 201 (2001)). A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (quoting al-Kidd, 563 U.S. at 741) (some internal marks omitted). "The plaintiff bears the burden to show that the contours of the right were clearly established." Clairmont v. Sound Mental Health, 632 F.3d 1091, 1109 (9th Cir. 2011). "[W]hether the law was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition." Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002) (citation and internal marks omitted).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds Defendant is not entitled to qualified immunity. First of all, Plaintiff has clearly alleged the deprivation of an actual constitutional right, i.e., an Eighth Amendment right to be protected from the use of excessive force. See Hudson, 503 U.S. at 6-7. Secondly, Defendants have failed to establish that their conduct was reasonable. Viewing the evidence in the light most favorable to Plaintiff, the force used in extracting him from his cell and placing him in a restraint chair was unreasonable under the circumstances resulting in injury. Yet, Defendants claim their use of force during the extraction and subsequent application of the restraint was not excessive and Plaintiff suffered only minimal injuries. Defendants reason that the use of force was necessary only to secure Plaintiff into the restraint chair using a pain compliance technique. Because factual disputes exists as to the need and extent of physical force, it cannot be said, as a matter of law, that Defendants are entitled to qualified immunity. See Hervey v. Estes, 65 F.3d 784, 791 (9th Cir. 1995) ("Unreasonable force claims are generally questions of fact for a jury" and, as a result,

1   qualified immunity is not properly granted on such claims); Sims v. Zavala, No. 16-cv06779-JST,

2   2018 WL 11016208, at *10 (N.D. Cal. Mar. 26, 2018) (denying qualified immunity because there

3   was a question of material fact as to whether Plaintiff and other inmate had stopped fighting prior

4   to deployment of force); Provencio v. Vazquez, No. 1:07-cv-00069-AWI-JLT, 2010 WL

5   2490937, at *5 n. 5 (E.D. Cal. June 16, 2010) ("[U]sing force after compliance has been achieved

6   is constitutionally unsound.") (citing LaLonde v. County of Riverside, 204 F.3d 946, 961 (9th

7   Cir. 2000); see also Schwenk v. Hartford, 204 F.3d 1187, 1196 (9th Cir. 2000) ("[S]ummary

8   judgment based on qualified immunity is improper if, under the plaintiff's version of the facts,

9   and in light of the clearly established law, a reasonable officer could not have believed his

10   conduct was lawful.") (citing Grossman v. City of Portland, 33 F.3d 1200, 1208 (9th Cir. 1994)).

11        3.     Retaliation

12        In the operative complaint, Plaintiff claims that after the May 28, 2021 incident, he began

13   to have problems with various officers.  On or about June 3, 2021, Plaintiff asked officer Lucio

14   for a grievance sheet to write up the May 28, 2021 incident, but Lucio denied the request.

15   Plaintiff then mentioned writing a grievance against Lucio, which Lucio again denied Plaintiff a

16   grievance form.  Officer Lucio then placed Plaintiff in administrative segregation because he

17   would not tell him about why the inmates assaulted him.

18        In administrative segregation, Plaintiff only received one hour a day outside of his cell,

19   whereas general population units receive up to four to six hours a day.  Inmates in administrative

20   segregation can be disruptive at night and sometimes suffer mental health issues, causing them to

21   behave oddly, including throwing their own feces.

22        While in administrative segregation, Plaintiff also asked for a grievance form from officer

23   Sosa.  Officer Sosa denied the grievance form and searched Plaintiff's cell repeatedly when he

24   was out to court.  Sosa also denied Plaintiff showers, phone time, and exiting his cell.  Plaintiff

25   complained to sergeant Rafferty who said, "accusing her officers of harassment will get me

26   placed on suicide watch."  Officer Bailey denied Plaintiff's accusation about officer Sosa.

27        On June 29, 2021, officer Espericueta was controlling opening and closing inmate cell

28   doors, allowing Plaintiff's cell to be searched.  Officer Espericueta also denied medical services

1    when Plaintiff used his cell intercom to request medical attention.

2         Defendants argue that their actions were not taken in retaliation and they are entitled to

3    summary judgment.

4         Viewing the record in the light most favorable to Plaintiff, the Court finds that Plaintiff

5    has not demonstrated a triable issue of material fact as to whether Defendants Lucio, Sosa,

6    Bailey, Rafferty, and Espericueta engaged in retaliation in violation of the First Amendment.

7         A retaliation claim has five elements. Id. at 1114. First, the plaintiff must allege that the

8    retaliated-against conduct is protected. Id.  The filing of an inmate grievance is protected conduct,

9    Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005), as are the rights to speech or to petition

10    the government, Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985). See also Valandingham v.

11    Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).

12    Second, the plaintiff must show the defendant took adverse action against the plaintiff.  Rhodes,

13    408 F.3d at 567.  Third, the plaintiff must allege a causal connection between the adverse action

14    and the protected conduct. Waitson, 668 F.3d at 1114.  In other words, the plaintiff must show

15    that the retaliation was because of the protected conduct.  Fourth, the plaintiff must allege that the

16    "official" acts would chill or silence a person of ordinary firmness from future First Amendment

17    activities." Robinson, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "[A]

18    plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some

19    other harm," Brodheim, 584 F.3d at 1269, that is "more than minimal," Robinson, 408 F.3d at

20    568 n.11. Fifth, the plaintiff must allege "that the prison authorities' retaliatory action did not

21    advance legitimate goals of the correctional institution...." Rizzo, 778 F.2d at 532.

22         **a.**      **Defendant Lucio**

23         Plaintiff alleges Deputy Lucio refused to give him a grievance sheet, then placed him in

24    administrative segregation unit.  Defendant Lucio declares that when he approached Plaintiff,

25    Plaintiff had filled out a medical slip requesting mental health services claiming he was suicidal.

26    (Lucio Decl. ¶¶ 8-9.)  In response to the slip, Plaintiff was placed in a suicide watch cell.  (Lucio

27    Decl. ¶ 10.)  While in those cells, inmates are not allowed to allowed to have anything other than

28    pre-approved items due to inmate safety.  (UF 14.)  Lucio does not recall Plaintiff requesting a

grievance sheet, but declares that even if he had, Lucio would not have been able to accommodate that request, as Plaintiff is only allowed the approved items.  (Lucio Decl. ¶ 12.)  Plaintiff filed a grievance on June 14, 2021, shortly after the suicide watch cell placement.  (UF 15.)

Here, viewing the evidence in the light most favorable to Plaintiff, no reasonable juror could find that the alleged denial of a grievance form had any effect on Plaintiff's First Amendment right to file grievances, as he filed a grievance shortly after his placement in administrative segregation.  Thus, Plaintiff has failed to demonstrate any harm the failure to provide a grievance form constituted adverse action under the First Amendment.

Further, with regard to Plaintiff's placement, he concedes the placement was not in retaliation to the grievance issues, but rather because Plaintiff refused to provide information as to the inmate on inmate assault he was involved in.  (ECF No. 18 at 6; ECF No. 22 at 3.)  Deputy Lucio declares that Plaintiff had been initially placed in general population with other Blood gang members, but he was jumped by other Blood inmates from Kern County.  (Lucio Decl. ¶ 24.)  As a result, the only option available was to place Plaintiff in protective custody.  (Lucio Decl. ¶ 25.)

The United States Supreme Court has found that "the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say," Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 797 (1988).  However, some "courts have expressed skepticism that prisoners have a right against compelled speech, particularly in the context of a legitimate investigation." Williams v. Brown, No. 17-cv-11-BBC, 2017 WL 782958, at *2 (W.D. Wis. Feb. 28, 2017) (citing cases); see also Ayala v. Harden, No. 1:12-cv-00281-AWI, 2012 WL 4981269, at *2 (E.D. Cal. Oct. 17, 2012) ("Refusal to become an informant is not a protected First Amendment activity."); Wilcher v. Raemisch, No. 12-cv-803-JDP, 2014 WL 3509395, at *5 (W.D. Wis. July 15, 2014) (opining in dicta that the "weight of authority probably supports defendants' view that the refusal to answer legitimate investigatory questions in a prison is not protected speech," but finding that the court need not reach the issue). Inmates certainly retain constitutional rights, however, such "rights may be restricted in ways that would raise grave First Amendment concerns outside the prison context." Gee v. Pacheco, 627 F.3d 1178, 1187 (10th Cir. 2010) (quotation omitted).  Nevertheless, the

20

Supreme Court has determined that a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974).

This Court could not locate a case by the United States Supreme Court or Ninth Circuit which establishes a prisoner's First Amendment right to withhold information from correctional staff about the commission of a crime within prison as protected activity under the First Amendment. Indeed, the Ninth Circuit recently affirmed qualified immunity on this issue finding that "First Amendment compelled speech and retaliation claims ... were not established in any circuit at the time of the alleged violation, and still are not established in the circuit." Mora-Contreras v. Peters, 851 F. App'x 73, 74 (9th Cir. 2021); but see Burns v. Martuscello, 890 F.3d 77, 84, 94 (2d Cir. 2018) (the Second Circuit has recognized such right stating, "the First Amendment protects a prisoner's right not to serve as an informant); Powell v. Wilner, No. 06-cv-00545-WYD-MEH, 2009 WL 840756, at *1 (D. Colo. Mar. 30, 2009) (recognizing a "First Amendment right not to speak."); David v. Hill, 401 F.Supp.2d 749, 757 (S.D. Tex. 2005); Jackson v. Johnson, 15 F. Supp. 2d 341, 364 (S.D.N.Y. 1998) (assuming, without deciding, that an inmate has a constitutional right to refuse to participate in a prison investigation); Soto v. New Jersey, No. CV17-13450-FLW-DEA, 2020 WL 2537857, at *5 (D.N.J. May 19, 2020) (same).

While this ruling may be troublesome, this Court is, nevertheless, bound by the law of the United States when it comes to qualified immunity analysis and this Court's role.[6] Therefore, in the context of this qualified immunity analysis, the Court is directed to forego making a determination of whether an inmate maintains a First Amendment right to not speak to correctional officers regarding an investigation because federal courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." Cty. Ct. of Ulster Cty., N. Y. v. Allen, 442 U.S. 140, 154 (1979). This is particularly so in this instance because as explained below it is clear that Defendants are

---

[6] The Court does not suggest, at all, that the averments given by the Plaintiff are in fact true, nor the denials by the Defendant, for that matter. However, it is concerning that if true (as determined by a trier of fact in the adjudicative process), the Plaintiff was placed in administrative segregation for refusing to speak.

1   entitled to qualified immunity.[7]

2          Applying the applicable law set forth above in section 2(c), it is not clearly established

3   whether inmates maintain a First Amendment right to withhold information from correctional

4   staff about the commission of a crime within prison. Mora-Contreras, 851 F. App'x. at 74; see

5   also Rivera v. Long, No. 19-cv-03608-CMA-NYW, 2021 WL 5917453, at *16 (D. Colo. Dec. 10,

6   2021) (analyzing same retaliation claim under the First Amendment finding inmate's right to

7   refuse to participate in a prison investigation was not clearly established at the time of the alleged

8   retaliation).  Accordingly, because an inmate's right to refuse to provide information relating to a

9   prison investigation was not clearly established in 2021 (and is not today), no reasonable prison

10  official would have been on notice that their conduct violated Plaintiff's constitutional rights.

11  Moreover, even if the Second Circuit's decision in Burns could be viewed as clearly establishing

12  such right, the Court expressly declined to determine whether an inmate has constitutional right to

13  refuse to provide information about a past event. See Routt v. Howry, 835 F. App'x 379, 385

14  (10th Cir. 2020) (unpublished) (one case from another Circuit "is insufficient to constitute the

15  weight of authority from other circuits that is necessary to finding" clearly established law); see

16  also Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1278 (10th Cir. 2009) (a "handful of

17  decisions from courts in other circuits" which are not "broadly accepted" did not constitute

18  "weight of authority"). "[O]rdinarily a court would expect to see cases from at least three other

19  circuits before concluding that a right is clearly established." Prison Legal News, Inc. v.

20  Simmons, 401 F. Supp. 2d 1181, 1192 (D. Kan. 2005).

---

[7] Although Defendants did not raise qualified immunity on this claim in their motion for summary judgment, a district court may raise the issue of qualified immunity sua sponte and address that issue so long as the Defendant raised the issue in an answer and did not waive or abandon that defense, and the Plaintiff was provided notice and an opportunity to address the issue. Easley v. City of Riverside, 890 F.3d 851, 855 (9th Cir. 2018) rev'd on other grounds on hearing en banc, 765 F. App'x 282 (9th Cir. 2019) (failure to move for summary judgment on qualified immunity does not constitute waiver); see also Combs v. Williams, No. 2:18-cv-00337-JAD-BNW, 2022 WL 706451, at *3 (D. Nev. Mar. 9, 2022) (qualified immunity is an affirmative defense, but "a court may sua sponte grant summary judgment if the plaintiff is 'given reasonable notice that the sufficiency of his or her claim will be in issue.' " (citing Verizon Del. Inc. v. Covad Comms. Co., 377 F.3d 1081, 1092 (9th Cir. 2004) (quoting Buckingham v. United States, 998 F.2d 735, 742 (9th Cir. 1993))); 28 U.S.C. § 1915(e)(2) (court may sua sponte dismiss without notice a complaint, or portion of a complaint, filed by plaintiff proceeding in forma pauperis when it determines that the complaint fails to state a claim upon which relief can be granted or seeks monetary relief from a defendant who is immune from such relief).  Here, Defendants asserted the defense in their answer, no party has argued the defense has been waived, and Plaintiff was given notice that the sufficiency of his claim is at issue.

1          **b.      Defendant Sosa**

2          Plaintiff alleges that Defendant Sosa denied a grievance form, searched his cell, denied

3    shower, phone and recreation privileges.[8]

4          Defendant Sosa declares that other than suicide watch, he would not have denied Plaintiff

5    a grievance form if he had one on him.  (Sosa Decl. ¶¶ 33-34; Bailey Decl. ¶¶ 3-10.)  Sosa also

6    declares that he does not determine inmates' programming relating to shower, phone or recreation

7    privileges as those are set to a routine schedule which is followed by the shift controller.  (Sosa

8    Decl. ¶ 32; Espericueta Decl. ¶¶ 18-14.)  Sosa acknowledges that he searched Plaintiff's cell

9    when he was out to court.  (Sosa Decl.¶ 11.)  Deputies are required to search cells as part of their

10   duties and are encouraged to search at least three cells each shift.  (Sosa Decl. ¶ 5; Bailey Decl. ¶

11   18.)  Sosa declares that because Plaintiff is staff assaultive, the deputies do not search his cell

12   when he is present because it creates an additional risk for harm for both the inmate and the

13   deputy.  (Sosa Decl. ¶ 5; Bailey Decl. ¶ 17.)  Instead, inmates who are staff assaultive have their

14   cells searched while they are away.  (Sosa Decl. ¶ 5; Bailey Decl. ¶ 17.)

15         Here, viewing the evidence in the light most favorable to Plaintiff, no reasonable juror

16   could find that the alleged denial of a grievance form had any effect on Plaintiff's First

17   Amendment right to file grievances, as he filed a grievance shortly after his placement in

18   administrative segregation.  Thus, Plaintiff has failed to demonstrate any harm the failure to

19   provide a grievance form constituted adverse action under the First Amendment.

20         With regard to the programming privileges, officer Sosa declares that he does not have the

21   authority or power to grant or deny any of the privileges.  Thus, Defendant Sosa has met his

22   initial responsibility of identifying those portions of the record that show there is no genuine issue

23   of material fact that he retaliated against Plaintiff by denying his programming privileges.

24   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden now shifts to Plaintiff to establish

25   that a genuine issue as to any material fact actually exists. Matsushita Elec. Indus. Co., 475 U.S.

26   at 586.  Plaintiff has failed to meet his burden. Plaintiff offers nothing more than speculation and

27   conclusory statements to the contrary; however, that is insufficient. See Wood v. Yordy, 753 F.3d

28   _____

     [8] Plaintiff does not provide the applicable date(s) of Defendant Sosa's actions.

899, 905 (9th Cir. 2014); Soremekun, 509 F.3d at 984; Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993).  In fact, Plaintiff does not dispute the fact that Sosa has no authority to grant or deny program privileges.

Lastly, with regard to the cell searches, Plaintiff contends that officer Sosa would destroy his paperwork, property, and drawings which he used as a form of stress relief.  Officers Sosa and Bailey declare that cell searches are part of their routine duties and if an inmate is staff assaultive, as Plaintiff, the cell is search in absentia.  Officers are looking for contraband, trash, weapons, or anything that is broken, along with untaken medication and pruno.  (Sosa Decl. ¶ 8.)  In response to Defendant's motion and supporting evidence, Plaintiff does not provide evidence to dispute these facts and offers no evidence refuting Defendant Sosa's justification for the search or indicating a retaliatory purpose.  Nor does Plaintiff present evidence to contradict the proffer that officers are supposed to randomly search at least three cells a day to ensure the penological interest of prison security and safety. (Sosa Decl. ¶ 7.); see Hudson v. McMillian, 468 U.S. at 529 (recognizing that cell searches to locate contraband can achieve the goal of prison security).  Further, Defendant attests that he was unaware of the bus incident, and Plaintiff offers no evidence in opposition to show otherwise. Id.  Without evidence of retaliatory motive based on the need for filing a grievance, Plaintiff's claim in this regard is conclusory.  See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) (to prevail on a retaliation claim, a plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct.").  Accordingly, summary judgment should be granted in favor of Defendant Sosa.

### c.     Defendant Bailey

Plaintiff claims that on June 29, 2021, Plaintiff explained to officer Bailey that he wanted to file a grievance against Luevanos and Lucio but was denied by officer Sosa.  Officer Bailey denied any wrongdoing on the part of officer Sosa and did so after Plaintiff mentioned writing a grievance against sergeant Luevanos.

///

///

No reasonable jury could find that officer Bailey took "adverse action" by denying any wrongdoing on the part of officer Sosa.[9]  Indeed, if the denial of a grievance—or even refusal to process one—is not adverse action under the First Amendment, see, e.g., Richey v. Dahne, 733 F. App'x 881, 884 (9th Cir. 2018) ("adverse regulatory action" element "refers to some additional punitive action or threat of punitive action over and above merely refusing to accept the grievance"), it cannot be said that simply denying wrongdoing on the part of another officer would constitute adverse action under the First Amendment.  See Owens v. Coleman, 629 F. App'x 163, 167 (3d Cir. 2015); Dicey v. Hanks, No. 2:14-cv-2018 JAM AC P, 2015 WL 4879627, at *5 (E.D. Cal. Aug. 14, 2015).  If that were true, the mere denial of allegations and/or rejection of prisoner grievances would be enough to form the factual predicate of First Amendment retaliation claims for nearly every one of the countless prisoner grievances that are denied in state prisons. Cf. Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (reiterating that "inmates lack a separate constitutional entitlement to a specific prison grievance procedure"); Evans v. Skolnik, 637 F. App'x 285, 288 (9th Cir. 2015) ("An allegation that a prison official inappropriately denied or failed to adequately respond to a grievance, without more, does not state a claim under § 1983.").

### d.    Defendant Rafferty

Plaintiff alleges that sergeant Rafferty threatened, "accusing her officers of harassment will get me placed on suicide watch".

Sergeant Rafferty declares that she recalls this encounter on June 29, 2021, as Plaintiff began by reporting on other deputies' behaviors, but then threatens to harm himself.  (Rafferty Decl. ¶¶ 17, 18, 21, 22.)  Rafferty recalls asking more questions regarding the seriousness of Plaintiff's threat, explaining she will be forced to place him on suicide watch, if necessary.  (Rafferty Decl. ¶¶ 19, 22.)  When Plaintiff entered the infirmary on this date, the only cell that was available was a suicide watch cell.  (Rafferty Decl. ¶ 11.)  Rafferty submits that at Lerdo Justice Facility, the medical observation cells have adjustable beds, smaller windows, and are

---

[9] In his opposition, Plaintiff appears to argue that Deputy Bailey acted with deliberate indifference to a serious medical need in violation of the Eighth Amendment.  (ECF No. 81 at  4.)  However, such claim was found to be non-cognizable and was dismissed by the Court on June 29, 2022 (ECF No. 31).

close to the nurse's station.  (Rafferty Decl. ¶ 12.)  The suicide watch cells have concrete beds, full view windows, and are directly in front of the nurse's station.  (Rafferty Decl. ¶ 13.)  On a weekly basis there will be no medical observation bed available and staff have to place an inmate in a suicide watch cell for medical observation.  (Rafferty Decl. ¶ 14.)

Here, Plaintiff has also failed to identify a triable issue. The record is devoid of direct or circumstantial evidence that any statements made by Defendant Rafferty were made with the intent to punish Plaintiff for activity protected by the First Amendment. Because such a motive is an essential element of a retaliation claim, <u>Rhodes</u>, 408 F.3d at 567-68, this failure of proof is fatal to the claim.  Plaintiff fails to set forth any evidence to contract the declaration provided by sergeant Rafferty relating to the incidents on June 29, 2021.  Accordingly, summary judgment should be granted in favor of Defendant Rafferty on this claim.

**e.  Defendant Espericueta**

Plaintiff alleges Espericueta allowed his cell to be searched and denied him medical services.

Espericueta declares that her duties as a sheriff's aide include controlling the opening of the cell doors and she does not decide whose cell is to be searched.  (Espericueta Decl. ¶ 7.) Detentions deputies outrank sheriff's aides, so Espericueta was required to follow their direction, and if a deputy requested a cell door be she would follow such direction.  (Espericueta Decl. ¶¶ 8, 9.)  Espericueta does not have authority regarding medical attention or access to the medical unit. (Espericueta Decl. ¶ 16.)  When an inmate has a medical request, they fill out a medical slip and are seen by medical staff in a process outside of Espericueta's control.  (Espericueta Decl. ¶¶ 11-15.)

In opposition, Plaintiff fails to present any evidence to rebut that Espericueta was simply following directives from deputies to open his cell door and had no authority regarding medical attention.  Indeed, in the operative complaint, Plaintiff merely alleges that he has reason to believe that officer Espericueta was notified about the excessive force incident on May 28, 2021, because she was the officer in the control booth who opened and closed the cell door allowing officer Sosa to continuously search his cell.  (ECF No. 18 at 8.)  However, Plaintiff's speculation

26

that Defendant Espericueta allowed his cell to be searched and denied him medical services because he had filed a grievance, is not sufficient to create an issue of material fact. Such speculation regarding Defendant's motivation for his actions is insufficient to show that summary judgment should be denied. See Wood v. Yordy, 753 F.3d at 905 ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."); Nelson v. Pima Cmty. College, 83 F.3d 1075, 1081-82 (1996) (citation omitted) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); Halloum v. Ryan, No. CV 11-0097 PHX RCB, 2014 WL 1047144 at *7 (D. Ariz. Mar. 18, 2014) (granting summary judgment where plaintiff submitted no probative evidence that defendant was aware of plaintiff's protected conduct). Accordingly, Espericueta's actions advance the interests of the institution by following protocol and opening/closing doors based on the deputies' requests and there is no showing it was done in retaliation.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.    Defendants' motion for summary judgment be granted in part and denied in part as follows:

    a.    Granted as to Plaintiff's May 2021 excessive force claim against Defendant Luevanos;

    b.    Granted as to Plaintiff's September 2021 excessive force claim against Defendant Lucio;

    c.    Denied as to Plaintiff's September 2021 excessive claim against Defendants Luevanos, Valles, Magana, and Flores; and

    d.    Granted as to Plaintiff's retaliation claims against Defendants Lucio, Sosa, Bailey, Rafferty, and Espericueta.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file

written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 2, 2024**

_____
UNITED STATES MAGISTRATE JUDGE