UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JON-ERIK ROOSEVELT BOLDS, JR.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>LUEVANOS, et al.,<br><br>　　　　　Defendants. | No. 1:21-cv-01668-KES-SAB (PC)<br><br>ORDER ADOPTING IN PART FINDINGS AND RECOMMENDATIONS AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Docs. 71, 86 |

  Jon-Erik Roosevelt Bolds, Jr. is a pretrial detainee proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983. The matter was referred to a United States magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. Bolds alleges that (1) on May 28, 2021, defendant Luevanos used excessive force against him when removing him from a transportation bus, (2) on September 21, 2021, defendants Luevanos, Valles, Lucio, Magana, and Flores used excessive force against him when they used restraints to attempt to transport him to his court hearing, and (3) defendants Lucio, Sosa, Bailey, Rafferty, and Espericueta retaliated against him after he indicated his desire to file a grievance arising from the May 28 incident. *See generally* Doc. 18.

  On December 18, 2023, defendants moved for summary judgment as to each of Bolds's claims. Doc. 71. Bolds filed an opposition and defendants replied. Docs. 81, 82. On July 2,

2024, the assigned magistrate judge issued findings and recommendations, recommending defendants' motion for summary judgment be granted in part and denied in part. Doc. 86. Specifically, the magistrate judge found that defendants' motion should be (1) granted as to Bolds's May 2021 excessive force claim against defendant Luevanos, (2) granted as to Bolds's September 2021 excessive force claim against defendant Lucio, (3) denied as to Bolds's September 2021 excessive force claim against defendants Luevanos, Valles, Magana, and Flores, and (4) granted as to Bolds's retaliation claim against defendants Lucio, Sosa, Bailey, Rafferty, and Espericueta. *Id.* at 27. The findings and recommendations were served on all parties and contained notice that any objections were to be filed within twenty-one (21) days. *Id.* Neither party has filed objections and the time to do so has passed.

In accordance with 28 U.S.C. § 636(b)(1), the Court has conducted a de novo review of this case. Having carefully reviewed the file, the Court finds the findings and recommendations to be supported by the record and by proper analysis as to the grant of summary judgment to defendants on Bolds's May 2021 excessive force claim against defendant Luevanos, Bolds's September 2021 excessive force claim against defendant Lucio, and Bolds's retaliation claim against defendants Lucio, Sosa, Bailey, Rafferty, and Espericueta. The Court adopts the findings and recommendations as to each of those claims.

As to Bolds's claim that defendants Luevanos, Valles, Magana, and Flores used excessive force on him in the September 21, 2021 incident, the Court finds that, viewing the evidence in the light most favorable to Bolds, defendants are entitled to summary judgment on Bolds's claim. Therefore, the Court grants defendants' motion for summary judgment, Doc. 71, in its entirety.

**I.    September 21, 2021 Incident**

The record, viewed in the light most favorable to Bolds, shows the following.[1] Bolds was a pretrial detainee at Lerdo Justice Facility. Following an incident on May 28, 2021, where Bolds

---

[1] As the findings and recommendations note, Bolds neither filed a statement of undisputed facts, nor admitted or denied the facts set forth by defendants as undisputed. Therefore, defendants' statement of undisputed facts is accepted as undisputed except where brought into dispute by Bolds's verified complaint and opposition. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on the plaintiff's personal knowledge of specific facts which are admissible in evidence).

was uncooperative in coming off a bus, Bolds was classified as an "Orange Band." Doc. 71-10 at 2. Orange Band inmates are "high security risk inmates and require two officers while being moved." *Id.* Orange Band inmates are also required to be restrained to leave their cell, even during medical visits. *Id.* Starting June 8, 2021, Bolds's file contained a court order allowing force to be used to successfully transport him to court. Docs. 71-1 at 5, 71-3 at 6. The order was in effect at the time of the incident on September 21, 2021. Doc. 71-3 at 6.

On September 21, Bolds was to be transported in restraints to a court hearing. *Id.* Officer Velo was assigned to Bolds's unit and was tasked with escorting him out of his cell. Doc. 71-10 at 3.[2] Bolds refused to leave his cell, so Velo asked for assistance from Officer Valles. *Id.* Velo and Valles placed handcuffs on Bolds and brought him out of his cell. *Id.* After realizing that the ankle shackles that were readily accessible were too small for Bolds's ankles, Valles and Velo informed Bolds that they would put him in the visiting booth until they could take him to inmate receiving to find him the appropriately sized shackles. *Id.* at 3–4. Bolds responded "that's not going to happen." *Id.* Valles and Velo then pulled Bolds into the visiting booth while he was in restraints, causing Bolds's hands to swell. Doc. 18 at 4. Valles and Velo stated that if Bolds did not cooperate in going to his court hearing, they would "call [Luevanos] who snatched him off the bus to make [him] go to court." *Id.*

Because Bolds continued to refuse to cooperate, Valles and Velo called the sergeant on duty, Sergeant Luevanos. Doc. 71-10 at 4. Once Luevanos arrived, he asked Bolds "Is there anything I can do to get you out of the cell?" Doc. 71-3 at 6. Bolds requested to see a nurse. *Id.* Luevanos informed Bolds that he would take him to see a nurse, but he still would have to be placed in shackles for court. *Id.* Bolds refused to allow Luevanos to place him in shackles. *Id.* Attempting to bring Bolds out of the visiting booth, Luevanos placed his right hand on Bolds's left shoulder to control his movements. *Id.* at 7. Bolds screamed "Let me f--- go" and pulled back several times away from Luevanos. *Id.* Luevanos then ordered Bolds to stop resisting so he could be placed in shackles. *Id.* Bolds begged to walk on his own, but the officers refused his

---

[2] Officer Velo is not a defendant in this case.

1   request. Doc. 18 at 5. Bolds continued to curse, physically resist, and be combative. Doc. 71-3
2   at 7. He would thrash his body, cause the officers to lose grip of his arms and shoulders, drop his
3   weight, and plant his feet. *Id.*

4   Luevanos called for other officers to assist in restraining Bolds. Doc. 18 at 5. Officers
5   Magana, Flores, Richardson, and Dobbs came to assist. Doc. 71-3 at 8. As Bolds continued to
6   resist and threaten officers, Luevanos sought and obtained approval from Lieutenant Alkire to
7   place Bolds into a restraint chair. *Id* at 7. Bolds was placed into a restraint chair and the officers
8   applied a spit sock. *Id.* In attempting to secure Bolds to the restraint chair, Luevanos pulled and
9   snatched Bolds's head against the chair causing his head to bounce. Doc. 18 at 5. Luevanos
10  readjusted his hand, squeezed Bolds's head, poked his eye, and pulled his hair to keep his head
11  still. *Id.* Magana pushed down on the cuff restraints on Bolds's hands with his body weight
12  while Flores stood hard on his foot. *Id.* Flores stated that standing firmly on an inmate's foot
13  while their ankles are being strapped to the chair is necessary to prevent the inmate from kicking
14  deputies in the face. Doc. 71-1 at 8. The officers checked the wrist bands on Bolds in the
15  restraint chair to ensure they were not too tight. Doc. 71-3 at 8.[3]

16  After Bolds was ultimately restrained in the chair, he was brought to medical for
17  clearance. Doc. 71-10 at 5. There, the nurse checked his vitals and suggested that his left arm
18  restraint be loosened. *Id.* The officers loosened his left arm restraint. *Id.* Bolds was then placed
19  into a safety cell. *Id.* While he was being restrained, Bolds never indicated he was injured or in
20  pain. Doc. 71-3 at 8. On September 24, 2021, Bolds discovered he had bruising and swelling on
21  multiple parts of his body from the September 21 incident. Doc. 18 at 9.

22  **II.    Excessive Force**

23  The right of pretrial detainees to be free from excessive force is guaranteed by the Due
24  Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97
25  (2015). To succeed on an excessive force claim, a pretrial detainee must show that "the force
26  purposely or knowingly used against him was objectively unreasonable." *Id.* "Courts review

---

[3] Luevanos attests that, to check whether the bands are too tight, officers squeeze a fingernail. Doc. 71-3 at 8. If it does not turn pink, then the bands are too tight. *Id.*

1   these claims 'from the perspective of a reasonable officer on the scene,' and take into account the

2   particular facts and circumstances of each case.'" *Bell v. Williams*, 108 F.4th 809, 819 (9th Cir.

3   2024) (citing *Kingsley*, 576 U.S. at 397).  Courts consider factors including:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*  Judged against these factors, defendants' use of force against Bolds on September 21, 2021 was objectively reasonable.

## A. Severity of the Security Problem

As to the severity of the security problem at issue, courts consider an inmate's "history of dangerous behavior." *Bell*, 108 F.4th at 820.  Here, it is undisputed that Bolds was classified as a high-risk security threat given his prior disciplinary history.  Bolds was classified as "Orange Band," requiring that anytime he was transported, he was to be escorted by at least two officers and restrained.  There was also a court order in place authorizing necessary force to transport Bolds to court hearings.  Moreover, Luevanos attests that, during his 33-year career, Bolds is at the "top 5% of highly combative, most difficult and most aggressive inmates." Doc. 71-3 at 8.  Luevanos states Bolds is at least 6'3" with big legs, big arms, and a very big torso, and estimates Bolds to be upwards of 280 pounds.  *Id.*  Defendants reasonably considered Bolds's high likelihood of resistance when determining the amount of force to use.  This factor weighs in favor of the defendants.

## B. Active Resistance

While a "detainee's in-the-moment compliance carries more weight when assessing his security threat than his prior non-compliant behavior," *Bell*, 108 F.4th at 820, here Bolds was actively resisting from the moment he was asked to leave his cell in preparation for court to when he was ultimately placed in the restraint chair.  Bolds cursed at the officers, dropped his weight, and thrashed his body to make it as difficult as possible for the officers to shackle him.  This

1 factor weighs in favor of the defendants.

### C. Threat Reasonably Perceived by Officers

"This factor overlaps with the first two. The security threat posed by [Bolds], and whether he was actively resisting at the time of the cell extraction, determine the threat level that an officer would reasonably perceive." *Id.* As noted, Bolds's history caused defendants to reasonably perceive him as posing a significant security threat when he would be transported or otherwise interact with prison officials. And Bolds continued to resist once defendants attempted to transport him. *See id.* at 820–21. This factor weighs in favor of the defendants.

### D. Efforts to Temper the Force Used

After it was apparent that Bolds was not going to comply with Valles and Velo's attempts to shackle him, as required by his high-risk classification, Luevanos attempted less intrusive means to transport him. First, he placed his right hand on Bolds's left shoulder to allow him to walk on his own while still retaining control of his movements. Doc. 71-3 at 7; *see Bell*, 108 F.4th at 821 (considering fact that deputies attempted to support inmate as he moved on his own as a reasonable effort to temper force used). Bolds screamed "let me f--- go" and pulled back with "great force using his body weight causing [Luevanos] to lose [his] grip and hit [his] arm against the partition in the cell." Doc. 71-3 at 7. Luevanos then attempted to place Bolds in a wheelchair as the officers could "roll [Bolds] backwards so [he] can't put [his] feet out and stop the movement." *Id*; *see Bell*, 108 F.4th at 821 (suggesting that officers could have placed detainee in wheelchair as an effort to temper force instead of picking him up by his handcuffed arms and legs). Bolds continued to resist by not allowing the officers to place him into a wheelchair. Doc. 71-3 at 7. Luevanos advised the lieutenant of the situation, and the lieutenant approved the use of the restraint chair. *Id.* Once Luevanos was properly in the restraint chair, defendants made efforts to ensure his bands were not too tight. This factor weighs in favor of the defendants.

### E. Extent of Bolds's Injuries

"A detainee's injuries may indicate, albeit imperfectly, the amount of force that was used to cause them. By serving as a proxy for the force used, the extent of a detainee's injuries

6

1  estimates the justification needed on the other side of the scale." *Bell*, 108 F.4th at 821. Bolds
2  contends that several days following the incident, he noticed bruising and swelling. These
3  injuries were relatively minor. *See Harris v. City of Kent*, No. 2:20-cv-01045-RSM-TLF, 2022
4  WL 1310080, at *7 (E.D. Cal. Mar. 11, 2022) (classifying "pain, bruising and swelling" as
5  "minor injuries" for purposes of excessive force analysis ); *cf. Williamson v. City of National*
6  *City*, 23 F.4th 1146, 1152–53 (9th Cir. 2022) (holding that handcuffing, lifting, pulling, and
7  dragging non-compliant plaintiff, resulting in sprained wrist and torn rotator cuff, was not an
8  excessive use of force). Bolds alleges no other injuries as a result of the incident. This factor
9  weighs in favor of the defendants.

### F. Relationship between Need for Use of Force and Amount of Force Used

"The foregoing factors inform the comparison between the amount of force needed and the amount of force used." *Bell*, 108 F.4th at 821. As discussed above, Bolds posed a high risk of resistance as noted by his Orange Band classification, he resisted Officer Velo's orders to comply with shackling for transport to his court hearing, and he continued to curse at and physically resist defendants' efforts to restrain him. Defendants pleaded with Bolds and gave him multiple opportunities to comply. They also attempted lesser intrusive means of compliance, such as attempting to escort Bolds in shackles while he walked, which Bolds resisted. Given Bolds's continued resistance, Luevanos reasonably decided to use a restraint chair. *See Dalluge v. Coates*, 341 F. App'x 310, 310–11 (9th Cir. 2009) ("When there is evidence of a legitimate security need, and no evidence of an intent to punish, the use of a restraint chair is not per se excessive."); *see also Ross v. County of San Diego*, No. 21-cv-2130-JO-VET, 2025 WL 934457, at *12 (S.D. Cal. Mar. 27, 2025) (collecting cases holding that restraint chair was a non-trivial but less than intermediate use of force). Defendants did not pick Bolds up by his handcuffs or shackles. *Cf. Bell*, 108 F.4th at 821 (noting that deputies' decision to pick up detainee by his handcuffed arms and leg was an unnecessary degree of force compared to supporting him while he moved on his own).

Bolds contends that Luevanos poked Bolds in the eyes, pulled his hair to keep his head still, and snatched his head back against the chair causing his head to bounce. Given Bolds's

7

1 physical resistance, it was not unreasonable for Luevanos to use force to position Bolds's head to
2 secure it with the forehead strap of the restraint chair. *See* Doc. 71 at 18 n.2. And given the
3 chaotic circumstances of the attempted restraint, the allegation that Bolds was poked in the eyes
4 during the struggle does not constitute excessive force, particularly as Bolds does not allege an
5 eye injury.

6      As to Flores stepping on his feet, Bolds does not dispute Flores's contention that this was
7 a necessary temporary measure to prevent Bolds from potentially kicking the officers. Magana's
8 pushing down on Bolds's cuff restraints was also a reasonable use of force to hold Bolds in place
9 in the chair while the other officers properly fixed the chair restraints to prevent his continued
10 resistance.

11      Even if an inmate previously disobeyed orders, once he complies, "*any* amount of
12 unnecessary force is objectively unreasonable" and "[p]ersisting in using force in such a situation
13 would amount to punishment" in violation of the Fourteenth Amendment. *Bell*, 108 F.4th at 822.
14 Here, significantly, there is no evidence that defendants used force on Bolds after he was
15 successfully placed in the restraint chair and began complying with officers. At that point,
16 defendants checked the restraint chair's bands to ensure they were not too tight. After medical
17 staff informed defendants that the left band might be too tight on Bolds, defendants loosened it.

18      In sum, viewing the evidence in the light most favorable to Bolds, defendants' actions
19 while attempting to put Bolds in the restraint chair were objectively reasonable. Bolds was
20 known to the defendants to be among the most aggressive and resistant detainees at Lerdo. *See*
21 Docs. 71-3 at 8, 71-6 at 3, 71-10 at 3. When officers sought to move him on September 21, 2021,
22 Bolds immediately resisted and continued to resist until he was ultimately placed in the restraint
23 chair. Among other tactics, he cursed at defendants, thrashed his body, dropped his weight, and
24 planted his feet. Bolds never indicated that he was in pain. Nor did Bolds have any pre-existing
25 injuries of which defendants were aware. While Bolds discovered bruising and swelling in the
26 days following the incident, these injuries were "relatively minor" considering the need Bolds
27 created for prison officials to apply reasonable force to control him. *See Bell*, 108 F.4th at 821;
28 *see also White v. Roper*, 901 F.2d 1501, 1507 (9th Cir. 1990) (affirming summary judgment in

favor of defendants as to pretrial detainee excessive force claim where detainee who suffered cut wrist and bruises created need for prison officials to apply reasonable force to control him).

On this record, no reasonable jury could find that defendants used excessive force on Bolds on September 21, 2021. Therefore, defendants did not violate Bolds's Fourteenth Amendment right to substantive due process, and they are entitled to summary judgment.[4]

Accordingly:

1. The findings and recommendations issued on July 2, 2024, Doc. 86, are adopted in part, as explained above;
2. Defendants' motion for summary judgment, Doc. 71, is granted in its entirety; and
3. The Clerk of Court is directed to enter judgment in favor of defendants and to close this case.

IT IS SO ORDERED.

Dated:  November 18, 2025

UNITED STATES DISTRICT JUDGE

---

[4] Defendants argue that, even if they committed a constitutional violation, they were not in violation of clearly established law and are therefore entitled to qualified immunity. Doc. 71 at 21. Because the Court finds that defendants did not violate Bolds's constitutional rights, it need not consider whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 230–32 (2009).